J-S60001-14
J-S60002-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: M.E.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.F., NATURAL MOTHER | No. 977 MDA 2014 |

Appeal from the Decree May 15, 2014
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 28 ADOPT 2014
CP-22-DP-109-2012

----------------------------------------------------------------------------------

| IN THE INTEREST OF: M.A.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.F., NATURAL MOTHER | No. 978 MDA 2014 |

Appeal from the Decree May 15, 2014
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 29 Adopt 2014
CP-22-DP-0000110-2012

BEFORE: OTT, J., STABILE, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 12, 2014**

M.F. ("Mother") appeals from the decrees involuntarily terminating her parental rights and the orders changing the goal to adoption, with respect to her minor son, M.E.F., born in April of 2007, and to her minor daughter,

M.A.F., born in March of 2011 ("the Children"), entered in the Court of Common Pleas of Dauphin County.[1] We affirm, and we grant the motion for leave to withdraw as counsel filed by Mother's counsel.[2]

The record reveals the relevant factual and procedural history, as follows. Six weeks after the birth of M.A.F., in April of 2011, Mother placed the Children with their maternal grandmother ("Grandmother") due to Mother's substance abuse and mental health issues. N.T., 5/15/2014, at 46. In September of 2012, Grandmother requested assistance from Dauphin County Social Services for Children and Youth ("the Agency"), due to financial difficulties. *Id.* Following a hearing, the Children were adjudicated dependent by orders entered on December 24, 2012. The Children were placed in kinship foster care with Grandmother.

On April 23, 2014, the Agency filed petitions to terminate Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511, and to change the Children's permanency goals to adoption. A combined termination and goal change hearing was held on May 15, 2014. During the hearing, the court heard the testimony of Kristina Taylor, the Agency caseworker; Lara Dietrich, program director and therapist at Northwestern

---

[1] The parental rights of the Children's unknown father or fathers were terminated by separate decrees entered that same day.

[2] We observe that the orphans' court presided over a combined termination and goal change hearing.

Human Services Capital Region Partial Hospitalization; Amanda Snyder, clinical director at Genesis House, an outpatient drug and alcohol treatment center; and Mother. On May 16, 2014, the orphans' court entered decrees of termination of Mother's parental rights and orders for goal change to adoption. On June 9, 2014, Mother's counsel timely filed separate notices of appeal. In the notices of appeal, counsel included statements pursuant to Pa.R.A.P. 1925(c)(4), indicating that Mother's appeal was frivolous, and that counsel intended to file a motion for leave to withdraw, and to file a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), *Commonwealth v. McClendon*, 434 A.2d 1185 (Pa. 1981), and *In re V.E. and J.E.*, 611 A.2d 1267 (Pa. Super. 1992). Mother's counsel filed his *Anders* brief and motion for leave to withdraw on August 4, 2014.

Before reaching the merits of the issue raised in the *Anders* brief, we must address counsel's request to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) (stating, "[w]hen faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw[]") (citation omitted). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)).

Our Supreme Court, in *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), stated that an *Anders* brief must comply with the following factors:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 361.

With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Mother's counsel has satisfied the first requirement of *Anders* by filing a motion to withdraw, wherein he asserts that he has made a conscientious

review of the record and determined the appeal would be frivolous. Counsel

has satisfied the second requirement by filing an **Anders** brief that complies

with the requirements set forth in **Santiago**, **supra**. With respect to the

third requirement, counsel has attached to the motion to withdraw a copy of

the letter sent to Mother advising her of her rights, and enclosing a copy of

the **Anders** brief. Thus, we conclude that counsel has complied with the

**Anders** requirements.

We next determine whether Mother's claim is wholly frivolous.

Counsel states Mother's claim as follows:

> Are the TPR orders supported by clear and convincing evidence
> sufficient to establishing a lawful basis for involuntarily
> terminating [M]other's parental rights under 23 Pa.C.S. §
> 2511(a), or for directing goal changes for her children's adoption
> under 23 Pa.C.S. § 2511(b)?

**Anders** Brief at 4 (footnote omitted).

Our standard of review is as follows:

> [A]ppellate courts must apply an abuse of discretion standard
> when considering a trial court's determination of a petition for
> termination of parental rights. As in dependency cases, our
> standard of review requires an appellate court to accept the
> findings of fact and credibility determinations of the trial court if
> they are supported by the record. **In re: R.J.T.**, 608 Pa. 9, 9
> A.3d 1179, 1190 (Pa. 2010). If the factual findings are
> supported, appellate courts review to determine if the trial court
> made an error of law or abused its discretion. **Id.**; **R.I.S.**, 36
> A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often
> stated, an abuse of discretion does not result merely because
> the reviewing court might have reached a different conclusion.
> **Id**.; **see also Samuel Bassett v. Kia Motors America, Inc.**,
> 34 A.3d 1, 51 ([Pa.] 2011); **Christianson v. Ely**, 838 A.2d 630,
> 634 (Pa. 2003). Instead, a decision may be reversed for an

abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the Agency petitioned to have Mother's parental rights terminated under Sections 2511(a)(1), (2), (5), (8), and (b). We conclude that the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:[3]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

---

[3] Here, the orphans' court did not specify which subsection it was relying upon to terminate Mother's rights. This Court need only agree with any one subsection of 23 Pa.C.S.A. § 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

With respect to Section 2511(b), the requisite analysis is as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884

A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Upon review, the record evidence supports the termination of Mother's parental rights pursuant to Section 2511(a)(2), as follows. Ms. Taylor, the Agency caseworker, testified that that the following family service plan ("FSP") objectives were established for Mother, in part: to undergo a psychological evaluation and follow through with recommendations and take medications as prescribed; to obtain a drug and alcohol evaluation and follow through with recommendations; to obtain safe, sanitary, and legal housing, and obtain a legal source of income and provide proof upon request; to attend and participate in the Children's medical, dental, and educational appointments and meetings; to complete reunification services; and to attend and actively participate in all scheduled visits with the Children. N.T., 5/15/2014, at 50-72.

Concerning the FSP objective that Mother undergo a psychological evaluation and follow through with recommendations and take medications

as prescribed, Ms. Taylor testified that Mother did complete a psychological evaluation. *Id.* at 52. However, Mother failed to comply with her psychiatrist's recommendations to take the prescribed medications. *Id.* at 52-53. According to Ms. Taylor, Mother claimed that she "always feels better taking [] illegal substances instead of the legal medications and recommended medications prescribed for her." *Id.* at 53.

Ms. Lara Dietrich testified that she was one of Mother's therapists at Northwestern Human Services Capital Region Partial Hospitalization, and that Mother began therapy in "mid-July 2013." *Id.* at 7-8, 10. Ms. Dietrich confirmed that Mother was diagnosed with, *inter alia*, schizophrenia, paranoid type; schizoaffective disorder; panic disorder; and marijuana abuse. *Id.* at 9, 11-12. Mother attended group therapy and individual therapy four days a week. *Id.* at 10. She was also "under medication management followed by a psychiatrist." *Id.* Ms. Dietrich stated that Mother failed to complete the program and was discharged on March 7, 2014. *Id.* at 15. Ms. Dietrich explained that Mother "was discharged because she refused to follow through with drug and alcohol treatment, which this treatment team felt was definitely hindering her ability to benefit from mental health treatment. She was also refusing all medication." *Id.* at 13-14.

Ms. Dietrich testified that Mother refused to take her medications because "she was afraid of weight gain and side-effects." *Id.* at 20. Mother

took one medication, the antidepressant Lexapro, for four days and complained that it made her "feel worse," and "feel like a different person." *Id.* at 19, 22. Ms. Dietrich stated that Mother "reported that she self-medicated with marijuana daily and that was her medication." *Id.* at 20-21. Ms. Dietrich also explained that Mother did not admit that she was experiencing the delusions and paranoia associated with her diagnosis of schizophrenia. *Id.* at 13. Mother stated during her own testimony that she disagreed with her schizophrenia diagnosis. *Id.* at 95.

Concerning Mother's FSP objective to obtain a drug and alcohol evaluation and follow through with recommendations, Ms. Taylor testified that Mother underwent a drug and alcohol evaluation, and attended rehabilitation at Roxbury Treatment Facility in Shippensburg, Pennsylvania, beginning on August 10, 2013. *Id.* at 54-55. However, Mother left the program. *Id.* at 55-56. On August 28, 2013, the day Mother wanted to be discharged, she asked the staff at Roxbury to take her to the hospital because she was not feeling well. *Id.* at 56. Mother did not appear to be ill, so she was admitted to Pennsylvania Psychiatric Institute ("PPI") instead. *Id.* Mother was discharged from PPI by her request, and against medical advice, on September 5, 2013. *Id.*

Ms. Taylor testified that another part of this FSP objective was to provide clean urine screens. *Id.* at 57-58. Ms. Taylor explained that Mother was very open about her marijuana use and, over the past year, had

provided only one urine screen, which was positive for marijuana. *Id.* at 58. Ms. Taylor stated that, "[o]ther than that, she either has not come into Agency when requested or she is always able to state when she has used." *Id.* Ms. Taylor indicated that Mother admitted to smoking marijuana on a daily basis. *Id.* at 54, 91-92.

Ms. Amanda Snyder testified that she had worked with Mother as a drug and alcohol counselor prior to becoming the clinical director at Genesis House. *Id.* at 25-26. Ms. Snyder explained that Mother was admitted to Genesis House on May 8, 2013, and that she had performed an initial assessment of Mother. *Id.* at 28-29. Based on information provided by Mother, Ms. Snyder believed that Mother suffered from marijuana abuse, alcohol abuse, and major depression. *Id.* at 31. Ms. Snyder concluded that Mother was in need of outpatient treatment, and recommended that she attend one group session and one individual session per week. *Id.* at 30. Mother attended two individual sessions on May 30, 2013, and June 6, 2013. *Id.* at 35. However, Mother did not attend any later sessions. *Id.* The staff at Genesis House called Mother twice and left messages, but to no avail. *Id.* at 36. Mother was discharged from the program due to her failure to participate. *Id.*

Concerning Mother's FSP objective to obtain safe, sanitary, and legal housing, and to obtain a legal source of income and provide proof upon request, Ms. Taylor testified that Mother complied with this objective, in

part, by applying for and obtaining Supplemental Security Income. *Id.* at 58. However, Mother had not maintained safe housing. *Id.* at 59. Ms. Taylor explained that Mother invited strangers into her residence. *Id.* For example, when the Children first came into care, Mother did not have electricity, so Mother invited another individual to stay in the home, who paid the bill. *Id.*

Concerning Mother's FSP objective to attend and participate in the Children's medical, dental, and educational appointments and meetings, Ms. Taylor testified that Mother did not attend the Children's appointments "steadily." *Id.* at 65. For example, M.E.F. attended play therapy from January 2013 until the summer of 2013. *Id.* at 66. M.E.F. initially attended play therapy on a weekly basis, but this was shortened to once every two weeks, and then monthly. *Id.* Ms. Taylor stated that Mother attended only one of M.E.F.'s play therapy appointments. *Id.* Ms. Taylor admitted that sometimes Mother did not know about the appointments due to short notice schedule changes. *Id.* at 65-67. Mother did attend two of the Children's medical appointments, but Ms. Taylor explained that there had been other appointments since that time at which Mother did not appear despite having notice. *Id.* at 68.

Concerning Mother's FSP objective to complete reunification services, Ms. Taylor testified that services were initially provided by an Agency caseworker. *Id.* at 69. Reunification services were taken over by Keystone

Reunification Services on March 5, 2013, and ended on August 2, 2013. *Id.* at 69-70. Ms. Taylor stated that Mother did not complete reunification services due to her "lack of engagement." *Id.* at 64.

Concerning Mother's FSP objective to attend and actively participate in all scheduled visits with the Children, Ms. Taylor testified that Mother was initially consistent in her visits. *Id.* at 60. Mother's visits with Children took place "mostly every week" at the Agency, and at Grandmother's home. *Id.* at 61. Ms. Taylor stated that a worker from Keystone Reunification Services had reported that Mother was "observed to be interactive with the children" during visits, but that, "during specific visits, she would become very interactive, also distant. There have been times where she's been observed playing on her phone as well as reading magazines." *Id.* at 60-61. Ms. Taylor noted that there were "a couple times" when Mother cancelled visits with the Children. *Id.* at 63. Mother missed one visit on July 2, 2013. *Id.* at 64. On that occasion, Ms. Taylor stated that Mother had informed her reunification worker that she "did not feel like being bothered to go to a visit." *Id.* Mother also missed a visit on July 19, 2013. *Id.* at 64. After reunification services closed in August of 2013, Mother visited with the Children weekly at the YMCA. *Id.* at 65. Ms. Taylor stated that, on August 8, 2013, Mother cancelled a visit after she called Grandmother and informed her that she wasn't feeling well. *Id.* at 64.

Thus, the testimonial evidence demonstrates that Mother has failed repeatedly to take the steps necessary to achieve reunification with the Children. With respect to her mental health treatment, Mother has outright refused to take prescribed medications, and has insisted instead on self-medicating with marijuana. Mother has clearly shown her incapacity as a parent, and this incapacity has left the Children without parental care or control. Based on the above testimony, it was reasonable for the orphans' court to conclude that Mother cannot, or will not, remedy this incapacity. As such, Mother's conduct warrants termination pursuant to Section 2511(a)(2).

Having determined that the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(2), we now review the decrees pursuant to Section 2511(b). With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Id.*** at 268 (citation omitted). Moreover, the Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." The Court observed

- 15 -

that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.* at 269.

Instantly, Ms. Taylor opined that it would be in the Children's best interests if Mother's parental rights were terminated. *Id.* at 73, 75. Ms. Taylor testified that Grandmother is a preadoptive resource, and that the Children are attached to Grandmother. *Id.* at 73-74. The Children have lived with Grandmother since April of 2011, when M.E.F. was four years old, and M.A.F. was six weeks old. *Id.* at 46. Ms. Taylor explained that the Children have a "very affectionate, very warming, very nurturing" relationship with Grandmother, and that the Children "gravitate towards" her. *Id.* at 74. Ms. Taylor testified that the Children view Grandmother as the person in their lives that will provide for them and keep them safe, and that while Mother has provided gifts, clothes, and food for the Children, they do not view Mother as their caretaker. *Id.* at 62, 74-75. Ms. Taylor stated that Mother "is not capable or has not been there" to provide for the Children emotionally. *Id.* Ms. Taylor indicated that the Children's developmental, physical, and emotional needs and welfare were being met in Grandmother's home, and that it would not be detrimental to the Children to terminate Mother's rights. *Id.* Based upon this testimony, we discern no

abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(b).

We next consider whether the orphans' court abused its discretion by changing the Children's permanency goal to adoption. Our standard of review is as follows:

> In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008), *appeal denied*, 959 A.2d 320 (Pa. 2008) (citations omitted); *see also In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

This matter is controlled by the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*, which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 671 *et seq*. *In re M.S.*, 980 A.2d 612, 615 (Pa. Super. 2009), *appeal denied*, 985 A.2d 220 (Pa. 2009). We have recognized that "[b]oth statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent. . . . ASFA promotes the reunification of foster care children with their natural parents

when feasible. . . . Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved 'whenever possible.'" *Id.* (citing 42 Pa.C.S. § 6301(b)(1)). As such, child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). When those efforts fail, the agency "must redirect its efforts toward placing the child in an adoptive home." *Id.*

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the following factors:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

- 18 -

. . . .

> (9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child . . . .

42 Pa.C.S. § 6351(f)(1)-(6), (9). "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, 943 A.2d at 978 (citation omitted). We have stated, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009), *appeal denied*, 973 A.2d 1007 (Pa. 2009).

In this case, during Mother's hearing, Ms. Taylor opined that it would be in the best interest of the Children to change their goals from reunification to adoption. N.T., 5/15/2014, at 76. Given Mother's repeated failure to make progress in achieving her family service plan objectives, and considering that Mother appears unlikely to ever complete these objectives, we conclude that the orphans' court did not abuse its discretion by changing the Children's goals.

Thus, upon our independent review of the record, we agree with Mother's counsel that the instant appeal is wholly frivolous. We therefore affirm the decrees of termination and orders for goal change, and grant counsel's motion for leave to withdraw.

Decrees and orders affirmed. Motion for leave to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/12/2014